UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

                              Plaintiff,

                                                    02 CV 0778 (SJ)

          - against -

                                                    MEMORANDUM &
                                                    ORDER

RICHARD JAMES and RONALD MALLAY,

                              Defendants.
-------------------------------------------------------------X
APPEARANCES:

BENTON J. CAMPBELL, ESQ.
United States Attorney, EDNY
271 Cadman Plaza East
Brooklyn, New York 11201
By:     James G. McGovern, Esq.
Attorney for the United States

EPHRAIM SAVITT, ESQ.
260 Madison Avenue, Suite 2200
New York, NY 10016
Attorney for Defendant Richard James

STEVE ZISSOU & ASSOCIATES
42-40 Bell Blvd., Suite 302
Bayside, NY 11361
By:     Steve Zissou, Esq.
Attorney for Defendant Richard James

KAPLAN & KATZBERG
767 Third Ave, 26th Floor
New York, NY 10017
By:     Kenneth J. Kaplan, Esq.

1

Attorney for Defendant Ronald Mallay

LAW OFFICES OF RICHARD JASPER
276 Fifth Avenue, Suite 501
New York, NY 10001
By:    Richard Jasper, Esq.
Attorney for Defendant Ronald Mallay

JOHNSON, Senior District Judge:

On May 21, 2004, Richard James ("James"), Ronald Mallay ("Mallay"),

Baskinand Motillal ("Motillal") and Betty Peter ("Peter") were indicted for several

racketeering and related charges, stemming from their involvement in conspiracies

to collect on life insurance policies taken out on members of their families,

extended families or other members of the Guyanese community (the "Mallay

Enterprise").  Specifically, James, Mallay and Motillal were charged with

Racketeering under 18 U.S.C. § 1961 (Count One), Conspiracy to Commit

Racketeering under 18 U.S.C. § 1962(d) (Count Two); Conspiracy to Commit Mail

Fraud under 18 U.S.C. §§ 371 and 1341 (Count Fourteen), and Conspiracy to

Commit Money Laundering under 18 U.S.C. § 1956(h) (Count Sixteen).  Betty

Peter was also named in Counts Fourteen and Sixteen in the indictment, for her role

in the mail fraud and money laundering conspiracy, as well as for three counts of

Obstruction of Justice under 18 U.S.C. §§ 1512(b)(3) and 3551 (Counts Seventeen,

Eighteen and Nineteen).  Count Nineteen also named Motillal as a participant.

James and Mallay (hereinafter "Defendants") faced additional counts that were not charged to Motillal or Peter, to wit: Conspiracy to Murder under 18 U.S.C. § 1959(b)(2) (Count Five); two counts of Conspiracy to Commit Murder for Hire, under 18 U.S.C. §§ 1958 and 3551 (Counts Six and Ten); two counts of Murder for Hire under 18 U.S.C. §§ 1958, 2 and 3551 (Count Seven and Count Eleven); Conspiracy to Murder under 18 U.S.C. §§ 1959(a)(5) and 3551 (Count Eight); and Murder, in violation of 18 U.S.C. §§ 1959(a)(1), 2 and 3551 (Count Nine).

In addition, Mallay was charged with Conspiracy to Commit Murder for Hire under 18 U.S.C. §§ 1958 and 3551 (Count Three); Murder for Hire under 18 U.S.C. §§ 1958, 2 and 2551 (Count Four); and Mail Fraud, under 18 U.S.C. §§ 1341 and 3551 (Count Fifteen). James was indicted for Solicitation to Murder under 18 U.S.C. §§ 272, 1959(a)(1), 2 and 3551 (Count Twelve); and Attempted Murder for Hire, under 18 U.S.C. §§ 1958, 2 and 3551(Count Thirteen).

The case against Motillal and Peter was severed on September 9, 2005, and proceeded to trial in January 2007. On February 5, 2007, Motillal was convicted of all counts charged against him and Peter was convicted of all but one obstruction count (Count Eighteen). Immediately following their convictions, Motillal and Peter (mother and son), agreed to testify in the upcoming trial of James and Mallay.

On May 8, 2007, the trial against James and Mallay commenced. The following is brief summary of the evidence adduced at trial.

*The Murder of Vernon Peter*

In 1991, Mallay was a postal carrier for the United States Postal Service. He was arrested and convicted of theft from the postal service. He was sentenced to 15 months imprisonment. While he was incarcerated, his mother died of a heart attack. Mallay blamed these problems on Vernon Peter ("Dilly"), because Mallay believed Dilly assisted in the investigation leading to his conviction. He then contacted his sister, Betty Peter, who was married to Dilly, and told her as much. Mallay advised Peter to stay up-to-date on the insurance policies on Dilly's life because he intended to get even.

Following Mallay's release from prison in 1993, he had a conversation with Baskinand Motillal, his nephew. Mallay gave Motillal what Motillal believed was an invitation for him to kill Dilly. Motillal declined the offer. However, Motillal subsequently introduced Mallay to Davindras Dass ("Dass"). Mallay offered Dass $10,000 for the hit. Dass agreed but said he needed money to purchase a gun; Mallay then gave him $500. Dass recruited his friends, Camuldeen Allie ("Allie"), "Barry" and "Fingers" to assist him. Dass was to be the triggerman, Allie and Barry the lookouts, and Fingers was to be the driver of the get-away car. When

Dass procrastinated, Allie agreed to be the shooter instead.

On the morning of July 28, 1993, Das, Allie, Barry and Fingers drove to Dilly's home, using Allie's car. Dilly came out of his home and Allie came behind him and shot him several times in the head. The four then fled in Allie's car. It was reported that someone saw the license plate of the get-away car. Allie decided that he would burn this car and then tell the police that it was stolen. In the process of burning the get-away vehicle, Allie suffered burns to his face and hands. Allie told Dass he needed his share of the "hit money" immediately because his burns could link him to the arson and subsequently the murder. Dass met with Mallay later that day and Mallay gave him $7,000[1] in cash. Mallay told Dass, "you see the way the mother fucker [Dilly] lay down like a dog in the street? You did a good job. I'm going to have something else for you later on."

Peter collected $400,000 in insurance proceeds following the death of her husband, used the money to purchase a house in her daughter's (Anjanee Motillal) name, and loaned Mallay at least $60,000. Peter's daughter, Anjanee Motillal ("Anjanee") maintained a bank account in the name of her brother Balram Motillal, who was illiterate. Anjanee collected rent, cashed checks and made loans (including checks from and loans to Mallay) through this account.

---

[1] The Court notes that there has been inconsistent testimony regarding amount of money offered for Dilly's murder. While Allie claims it was $7,000, Motillal testified that the amount was $10,000, with $3,000 paid upfront and $7,000 after the murder was committed. However, this discrepancy is of no consequence to the instant motions.

*The Murder of Alfred Gobin*

In September 1993, three months after Dilly's death, Richard James and Ronald Mallay met at the home of Gulabie Gobin ("Gulabie"), Mallay's mistress of 27 years. At the time, James was an insurance agent for Metropolitan Life ("MetLife"). James and Mallay convinced Gulabie to take out insurance on her father, Alfred Gobin ("Alfred"). Two policies were obtained. One named Alfred's ten children as beneficiaries, although it was later changed to name Balram Motillal, Mallay's nephew in whose name the Motillal/Peter family bank account was held, as beneficiary.

On January 6, 1996, Alfred Gobin was murdered in Guyana. Although Gulabie and her siblings never made a payment on her father's policies, they received at least $200,000 as beneficiaries. Gulabie subsequently lent James and Mallay almost $60,000.

*The Murder of Basdeo Somaipersaud*

Also after the murder of Dilly, James encouraged his friend, Satyanand Arjun ("Arjun") to partake in "investment opportunities" involving life insurance policies. Arjun had a friend, Basdeo Somaipersaud ("Somaipersaud"), who drank a lot and who lived with Arjun but spent a lot of time on the streets. James encouraged Arjun to take a out a policy on Somaipersaud's life. In October 1994,

6

without Somaipersaud's knowledge, James created a $100,000 policy on him, naming Virma Kassim, James' sister, as the beneficiary. The policy provided that in the event of an accidental death, an additional $100,000 would be paid to the beneficiary.

In the fall of 1997, Mallay approached Kenrick Hassan ("Kenrick"), a member of Mallay's extended family, and offered him $10,000 to kill Somaipersaud. Kenrick declined the offer.

On January 23, 1998, Somaipersaud was found dead in a park in Queens. James informed Arjun of Somaipersaud's death, which Arjun found unusual since the two were not well acquainted and James' relation to Somaipersaud did not extend beyond negotiating the insurance policy. James also attempted to collect money from Arjun for Somaipersaud's funeral but Arjun refused.

Somaipersaud died of a mixture of acute alcoholism and chlorpromazine. Maline Ramnarine, James' girlfriend, and Arjun, among others, received some of the proceeds from the policy.

*The Murder of Hardeo Sewnanan*

In October 1996, James negotiated and witnessed two $250,000 life insurance policies for Hardeo Sewnanan ("Sewnanan"), Mallay's nephew. Lazina Mallay (Mallay's wife), Betty Peter (Mallay's sister), and Anjanee Gobin (Mallay's

mistress, Gulabie Gobin's daughter) were named as beneficiaries. The policy was paid by "William Mallay," an individual who gave as his address as the same address as Ronald Mallay. In 1999, Mallay again asked Kenrick Hassan to commit murder, this time asking him to murder Sewnanan, who he described as an "alcoholic bum." Hassan declined but referred Mallay to his brother Derick Hassan ("Derick"), who lived in Guyana. Mallay traveled to Guyana to meet Derick. Mallay identified his nephew Sewnanan to Derick and gave him $10,000 for the project. However, Derick Hassan later backed out of the deal. On January 8, 1999, Sewnanan died in Guyana of poisoning. Mallay subsequently told Derick Hassan that he hired others in Guyana to kill Sewnanan. Mallay received $400,000 from the policy for Sewnanan.

*The Plot to Murder John Narinesingh*

Derick Hassan was persuaded by his brother, Kenrick, to come to the United States from Guyana to act as an informant. Wearing a hidden recording device, he met with James in May of 2001, inquired as to the nature of the Mallay Enterprise and whether there was any work he could do. James identified a "bum" in Harlem named John Narinesingh ("Narinesingh") and offered Derick $25,000 to kill him. James told Derick that there was a policy on Narinesingh for $250,000 and admitted he had a policy on another man's life that was scheduled to mature

the following week. James admitted he had to "diversify his thinking" and select "easy targets" (i.e., single men who drank heavily) because they often sleep outdoors, and have no wife, children or connections. In these conversations, James explained the logistical aspects of the Mallay Enterprise. Specifically, James told Derick that, while many people were interested in being involved, a two-year commitment was required, so that the policies could mature beyond the contestability period. James also told Derick that a policy can be maintained for as "cheap" as $1,000 per year. James admitted that he did not sell policies for commissions but, presumably, for the benefit of collecting on the proceeds. James expressed discontent with Mallay for proceeding with the Sewnanan murder prior to the end of the two-year contestability period. James stated that Mallay was deeply in debt, "borrows 20 for every 10" he makes, and is being "killed by the stress." Finally, James instructed Derick to poison Narinesingh during the July 4th weekend, when there is more activity in the streets, and asked Derick to cash an insurance-related check for him, or to find someone who could.

*Camuldeen Allie*

Camuldeen Allie was sentenced to 15 years to life in State Court in 1995 after he pled guilty to the murder of Vernon Peter. In 2002, he was contacted by an agent and prosecutors from the United States Attorney's Office. From 2002 until

9

2007, he had numerous contacts with the government without a cooperation
agreement. None of those meetings involved the James and Mallay trial team
(Assistant United States Attorneys ("AUSA") Lawrence Ferazani ("Ferazani"),
Robert Capers ("Capers") or James McGovern ("McGovern")). In 2007, with the
assistance of an attorney, Allie finally signed a cooperation agreement with the
government. The agreement required Allie to cooperate and testify truthfully at
James and Mallay's trial. The government's obligation was to write a letter to the
New York State Division of Parole ("Parole Board" or "Board") telling the Board
about Allie's cooperation and assistance to the federal government. Allie said he
expected the government to attach transcripts of his trial testimony to the letter.
Allie understood that the government would make no recommendations to the
Parole Board and understood the decision to release him from State custody rested
exclusively with the Parole Board.

*Jury Verdict*

On July 2, 2007, defendants James and Mallay were found guilty on several
counts of the indictment. James was found guilty of Racketeering (Count One),
Racketeering Conspiracy (Count Two), Conspiracy to Murder and Aid of
Racketeering as to Sewnanan and Somaipersaud (Counts Five and Eight), Murder
in Aid of Racketeering as to Somaipersaud (Count Nine), Solicitation to Commit

Murder for Hire as to Narinesingh (Count Twelve), Attempted Murder for Hire as to Narinesingh (Count Thirteen), Conspiracy to Commit Mail Fraud (Count Fourteen), and Conspiracy to Commit Money Laundering (Count Sixteen). Mallay was found guilty of all fourteen counts charged against him in the indictment: Racketeering (Count One), Racketeering Conspiracy (Count Two), Conspiracy to Murder in Aid of Racketeering as to Sewnanan and Somaipersaud (Counts Five and Eight), Murder in Aid of Racketeering as to Somaipersaud (Count Nine), Conspiracy to Commit Mail Fraud (Count Sixteen), Conspiracy to Commit Money Laundering (Count Fourteeen), Conspiracy to Commit Murder For Hire as to Alfred Gobin (Count Three), Murder for Hire as to Alfred Gobin (Count Four), Conspiracy to Commit Murder for Hire as to Sewnanan (Count Six), Murder for Hire as to Sewnanan (Count Seven), Conspiracy to Commit Murder for Hire as to Somaipersaud (Count Ten), Murder for Hire as to Somaipersaud (Count Eleven), and Mail Fraud (Count Fifteen).

*Camuldeen Allie July 2008 letter to this Court*

After the Parole Board denied his application for parole, Camuldeen Allie wrote to this Court, on July 14, 2008, "respectfully requesting the intervention of this Honorable Court . . . to have AUSA Capers definitively support [his] Administrative parole appeal." (7/14/08 letter from Allie to Court.) While he

previously testified in the trial of James and Mallay that he was paid by Mallay to kill Dilly, in this letter, he says that he "and others, accepted $7,000 from Mr. Peter's wife, Betty, for the murder." (Id.) At no point does Allie recant any of the testimony he offered at trial. On the contrary, he makes frequent reference to his "truthful" testimony as a basis for the assistance he is requesting from both the government and this Court. Moreover, his testimony at trial was entirely consistent with that of several witnesses, including Motillal, Peter, Gulabie Gobin and Dass.

*Pending Motions*

Presently before the Court are motions brought separately by James and Mallay, each seeking a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) ("Rule 29") based on the sufficiency of the evidence supporting their convictions; a motion for a new trial brought by Defendant James under Federal Rule of Criminal Procedure 33 ("Rule 33") based on the Court's suppression of conversations overheard by Peter regarding Sewnanan's death; and a joint motion for a new trial pursuant to Rule 33 based on the information contained in Allie's July 2008 letter. Specifically, Defendants argue that Allie's statement that Peter provided the $7,000 for Dilly's murder constitutes new evidence relevant to the government's case-in-chief and to the credibility of Peter, who testified against James and Mallay. (Def's Mot. at 4 (Docket No. 659).)

12

Defendants further argue that this statement evinces an error on the part of the Court in twice denying their motions to introduce excerpts of the government's summation in the Motillal/Peter trial, and a potential Brady/Giglio violation by the government (Id.) Defendants request a hearing to determine whether a new trial must be granted.

## DISCUSSION

*1.  Rule 29(c) Motions*

A defendant challenging the sufficiency of the evidence adduced at trial bears a heavy burden. United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002). Accordingly,

> [w]hen a defendant moves for a judgment of acquittal, the Court must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If it concludes that upon the evidence there must be such a doubt in a reasonable mind, it must grant the motion; or, to state another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If it concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, it must let the jury decide the matter.

United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) (collecting cases). Furthermore, it is "axiomatic," on a motion for acquittal, that all inferences be resolved in favor of the government, and, with respect to each element, the

evidence be viewed in the light most favorable to the government. <u>United States v.</u> <u>Artuso</u>, 425 F.2d 552, 554 (2d Cir. 1970).

*Defendant James*

The evidence presented at trial, merely summarized herein, overwhelmingly supports the jury's findings with respect to Defendant James. Essentially, James argues that, while conceding his guilt of the solicitation of murder and attempted murder of Narinesingh, the jury lacked substantial evidence to convict him of having any role in the plots to kill Sewnanan or Somaipersaud, as well as the remaining mail fraud, money laundering and racketeering charges. James argues that, because he was found not guilty of several charges (murder for hire and conspiracy to commit murder for hire as to both Sewnanan and Somaipersaud), there was no evidence from which the jury could conclude that he was guilty of conspiracy to commit murder in aid of racketeering with respect to those victims. Defendant's argument is without merit.

The evidence adduced at trial supports a finding that James was a member of the Mallay Enterprise, a group of individuals who participated in the procurement or maintenance of life insurance policies, recruited hired hands to commit murders of certain insureds, or simply benefited from the death of the insureds, either directly (via designation as a "beneficiary" under the policy), or

14

indirectly (via distributions made by Defendants). Specifically, the evidence indicated that James persuaded Arjun to begin "investing" in insurance policies, and that James thereafter persuaded Arjun to "invest" in a life insurance policy for Somaipersaud in February of 1992. Arjun's testimony that it was James who informed him of Somaipersaud's death and attempted to collect money for Somaipersaud's funeral, despite James not knowing Somaipersaud well or being in contact with him, provides further justification for the jury's verdict with respect to Counts Eight and Nine of the Superseding Indictment (charging Conspiracy to Commit Murder in Aid of Racketeering and Murder in Aid of Racketeering, respectively).

With respect to the death of Sewnanan, evidence at trial demonstrated that James negotiated the insurance policies, filed documents affecting the ownership and beneficiaries of the policies, and expressed frustration (during a wiretapped conversation) that Mallay had ordered Sewanan's death prior to the expiration of the contestability period. James was also heard saying that he insures "bums" for a living and "gets rid of them."

Evidence at trial supported a jury finding that James received the first disbursement from the funds Mallay collected on Alfred Gobin's policies and assisted in numerous transactions to assist in the transfer of ownership and change of beneficiaries to those without insurable interests in the insureds. He is also

heard on audio recording making statements as to the rules of entering the Mallay

Enterprise and stating that he has other insureds lined up for future hit-man work.

Given that "[t]he evidence is to be viewed 'not in isolation but in conjunction,'"

Mariani, 725 F.2d at 865 (quoting United v. Geaney, 417 F.2d 1116, 1121 (2d Cir.

1969), cert denied, 397 U.S. 1028 (1970)), it cannot be said that the jury lacked

sufficient basis to convict James of any of the nine counts (two of which are

uncontested) in the Superseding Indictment.


### Defendant Mallay

Even less persuasive is Defendant Mallay's Rule 29 motion, which --

despite the heavy burden facing a Rule 29 defendant -- states, in bare bones form,

that the government failed to prove every element of each offense in the

Superseding Indictment. However, the record contains more than substantial

evidence to support the jury's finding of guilty as to each count. Notably, Motillal,

Allie and Dass all testified to Mallay's recruiting them to commit Dilly's murder.

Additionally, Motillal testified to overhearing Mallay congratulating Dass on a job

well done, offering Dass more "work" in the future, and asking Peter for some of

the insurance proceeds. Motilal also testified that Mallay admitted to him his

involvement in the murders of Alfred Gobin and Sewnanan, which were both done

to secure insurance proceeds.

There was also testimony at trial that Mallay received money following the deaths of Vernon Peter and Alfred Gobin, and that Motillal's sister operated a bank account for the benefit of (at a minimum) Peter, Mallay, Motillal and herself, and that Mallay made withdrawals and deposits to this account via Anjanee Motillal, who did not know what Mallay did for a living, but knew his "business partner" was named "James." A close relationship involving daily contact between Mallay and James was also established at trial.

For these reasons, Defendants' motions for judgment of acquittal are denied.


2. *Rule 33 Motions As to Both Defendants*

"Motions for new trials based on newly discovered evidence are not held in great favor." United States v. Slutsky, 514 F.2d 1222, 1225 (2d Cir. 1975) (internal citation omitted). They are to be granted *only in the most extraordinary circumstances* and require a substantial showing. United States v. Diaz, 176 F.3d 52, 106 (2d Cir. 1999). Accordingly:

> [n]ewly discovered evidence does not warrant a new trial unless the defendant shows that: (1) the newly discovered evidence could not with due diligence have been discovered before or during trial; (2) where the claim is that the evidence shows perjury by a prosecution witness, the evidence demonstrates that the witness in fact committed perjury; (3) the evidence is 'material' to the jury's verdict; (4) the evidence is not 'cumulative' of other evidence

> introduced at trial as to a fact; and (5) the evidence could
> have affected the jury's verdict if it had been introduced at
> trial.

Id. Moreover, "the trial court's discretion to decide whether newly discovered

evidence warrants a new trial is broad because its vantage point as to the

determinative factor – whether newly discovered evidence would have influenced

the jury – has been informed by the trial over which it presided." United States v.

Stewart, 433 F.3d 273, 296 (2d Cir. 2006). It is with these considerations in mind

that the Court now turns to Defendants' argument that the Allie letter presents

newly discovered evidence warranting a new trial.


    a. *Allegations that Witness Coercion Constitutes "Newly Discovered Evidence"*

While Defendants argue that AUSA Capers threatened Allie into testifying

against them, this argument is wholly without merit. First and foremost, this claim

is impossible, as Allie testified that he decided to enter into an agreement with the

government in 2002, yet AUSA Capers did not join the office of the United States

Attorney until 2003, and did not work on the James and Mallay case until 2006.[2]

Not only can this fact not be disputed, but Allie himself testified that none of the

members of the James/Mallay prosecution team were present during the

---

[2] See Tr. at 2535-38 (testimony by Allie that he decided to cooperate with the government in 2002);
Gov't Opp. to Def. Mot. at 14 (indicating that, as of 2002, AUSA Capers had yet to be appointed as
an AUSA or assigned to this case).

negotiations that led to his decision to cooperate with the government. Moreover, Allie executed the cooperation agreement while represented by counsel. Therefore, the allegation that AUSA Capers threatened him into testifying against Defendants is a fabrication.

Secondly, while the Allie letter alleges coercion, at no point does he recant his testimony or even suggest that any relevant testimony was embellished or omitted. Instead, Allie attempts to seek this Court's help in securing his parole by citing his "truthful testimony," "sincere statements of contrition," and assistance in a "sensational" case in which "so many innocent people lost their lives for the egocentric and maniacal monetary gain of a few callous individuals."

Third, Defendants were well aware at the time of the trial of the substance of the agreement between Allie and the government, which provided, in pertinent part, that the government would inform the Parole Board of Allie's connection to the federal actions regardless of Allie's willingness to cooperate, but in no instance would the government recommend a particular outcome to his parole proceedings. Indeed, defense counsel cross-examined Allie about whether the government "would speak to New York State Parole Board and let them know exactly what took place." That Allie's incarcerated status might provide him motive to fabricate testimony in furtherance of the government's assistance is something that Defendants cannot, in good faith, argue is a revelation to them.

Therefore, with respect to Defendants' allegations of Allie's coercion by AUSA Capers, not only is the allegation baseless, but no newly discovered evidence has been shown to exist. Therefore, the Court does not reach the remaining four Rule 33 factors.

### b. *Alleged Giglio Violation*

Under <u>United States v. Giglio</u>, 405 U.S. 150 (1972), the government is required to disclose information tending to impeach a government witness, including a witness's agreement with the government. <u>Id.</u> at 153-4; <u>see also</u> <u>Williams v. Senskowski</u>, 2003 WL 22956999 (E.D.N.Y. Oct. 9, 2003) (Weinstein, J.). However, as explained, <u>supra</u>, at (II)(a), Defendants were aware of Allie's cooperation with the government and any motive he may have had to fabricate testimony. Moreoever, Allie was one of many witnesses testifying to Mallay's involvement in the enterprise, which fact further weakens his <u>Giglio</u> claim. <u>Cf.</u> <u>Giglio</u>, 405 U.S. at 154-5 (where government's case almost entirely depended on one witness, creditability issues are crucial); <u>United States v. Gambino</u>, 835 F. Supp. 74 (E.D.N.Y. 1993) (Glasser, J.) ("It is of more than slight significance to note that [in] <u>Giglio</u> . . . impeachment evidence of the *only* government witnesses was not disclosed.") Therefore, this argument is without merit.

20

c. *Alleged Perjury as "Newly Discovered Evidence"*

Defendants also argue that, because Allie's letter names Peter as the person who paid him and others $7,000 to murder Dilly, Allie therefore committed perjury in testifying that it was Mallay who did so. However, this argument fares no better. Allie's letter is not a recantation of his testimony but a reiteration of it and its importance in the trial of James and Mallay. Allie seeks the Court's help in helping him to be paroled based on his "truthful" testimony. The letter contains only a passing mention of Betty Peter as being the one who paid him for killing Dilly in its introduction.

Moreoever, "[e]ven where newly discovered evidence indicates perjury, motions for new trials should be granted only with great caution and in the most extraordinary circumstances," Stewart, 433 F.3d at 296, and Defendants have not demonstrated extraordinary circumstances.

To the extent Allie claims awareness of Peter's involvement in either the murder he committed or those crimes attributable to the larger criminal enterprise, according to both his testimony and his letter, his knowledge comes only from what he learned in the news following his conviction. If, as he claims, Allie learned of Peter's involvement through the news media while he was incarcerated, allegations that she paid him to commit the crime years before his incarceration are not credible. Moreover, Allie, upon learning of Peter's involvement in the scheme,

said he was "shocked," presumably in part because Peter had appeared years earlier at his state court sentencing, submitting a victim impact statement and recommending that he never be paroled for murdering her husband. Allie claimed that he learned thereafter that Peter played a role in her husband's murder while she simultaneously recommended the harshest sentence for Allie. These circumstances, and the fact that Allie maintains the truthfulness of his testimony, suggest that his attempt to finger Peter as the one who gave him the money is based on revenge.

However, the Court need not make a finding as to Allie's motivation. Assuming *arguendo* that Allie's statement that he was paid by Betty Peter constitutes new evidence of perjured testimony, a new trial is still unwarranted. In order to demonstrate entitlement to a new trial based on perjured testimony, Defendants must show either (A) that the prosecution knew or should have known of the perjury and that there is a reasonable likelihood that the false testimony could have affected the judgment of the jury or (B) that the testimony is material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted. United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991). As there has been no allegation that the government knew or should have known about any alleged perjury, the latter standard (indeed, the more demanding of the two) must apply.

"Evidence is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Amiel, 95 F.3d 135, 144-5 (2d Cir. 1996). Given the overwhelming evidence against both Defendants presented at trial, it cannot be said that, if, in fact, Allie had been paid by Peter instead of Mallay, a different verdict on any count would have resulted. Multiple witnesses, including Motillal, Peter and Dass, testified at trial to the conspiracy to kill Dilly, and in doing so, they each corroborated significant portions of Allie's testimony. As Allie's testimony was largely duplicative, it cannot be said to be material. Furthermore, and, again, assuming Allie's testimony was fabricated, the Court does not possess a "firm belief" that, but for his testimony, Defendants would have escaped conviction.

Therefore, Defendants are not entitled to a new trial on this basis.


d. *Alleged Brady Violations*

In Brady v. Maryland, the Supreme Court held that a new trial is warranted where the government fails to disclose favorable evidence and the undisclosed evidence was material. 373 U.S. 83, 87 (1963). As stated, supra, material evidence is that which has a strong potential to affect the result of a proceeding. Amiel, 95 F.3d at 144-5. The Court's earlier finding that Allie's letter presents no material

evidence is equally fatal as to Defendants' Brady claim, and as such, it too must be dismissed.

### e. *Defendant James' Rule 33 Motion*

In addition to the joint motions brought by Defendants under Rules 29 and 33, Defendant James has also submitted a separate Rule 33 motion seeking a new trial in the interests of justice. In this separate Rule 33 motion, James argues that he was prevented from mounting a successful defense because the Court refused to permit him to introduce certain statements that Betty Peter, during an *in camera* proceeding, claimed to have heard. However, the Court, at trial, already considered these statements and deemed them inadmissible hearsay. (Docket No. 528.) Moreover, the very statements James sought to admit through Peter were introduced through Motillal on cross-examination by James' counsel. (Tr. 3677-8.) Therefore, James' argument that the jury was precluded from hearing this argument is without merit.

### f. *McKeon Claim*

Defendants also argue that the "new evidence" presented in Allie's letter provides a basis for a new trial under United States v. McKeon, 738 F.2d 26 (2d

Cir. 1984). However, because the Court finds that the Allie letter presents no new evidence to Defendants, this argument is unpersuasive.[3]

### g. *Request for Hearing*

"In deciding a motion for a new trial a court is bound to conduct a 'thorough inquiry. . .to determine exactly what occurred." United States v. Persico, 339 F. Supp. 1077, 1083 (E.D.N.Y. 1972) (quoting Johnson v. United States, 207 F.2d 314 (5th Cir. 1953)). "However, a thorough inquiry does not necessarily involve the holding of a hearing." Persico, 339 F. Supp. at 1083. Indeed, "[t]he need for a hearing is diminished when, as here, the judge observed the demeanor

---

[3] Moreover, Defendants' underlying argument (i.e., that they should have been permitted to introduce excerpts of the government's summation in the trial against Peter into evidence in Defendants' trial) is without merit. While McKeon permitted the introduction of an earlier opening statement into a subsequent trial against the same defendant -- a situation not present in the instant case -- it does not hold that such statements are to be admitted as a matter of course. Indeed, the McKeon court found that "the evidentiary use of prior jury argument must be circumscribed in order to avoid trenching upon other important policies," 738 F.2d at 32, and based its decision to admit a prior opening statement in part on counsel's refusal to (on an *ex parte* basis) explain the reasons for the change in facts alleged. Id. at 29; see also id. at 33 ("Where the evidence [that the inconsistent statement has an innocent explanation] is in equipoise or the preponderance favors an innocent explanation, the prior . . . statement should be excluded."). Here, the government has stated that its understanding of the extent of Peter's involvement in the Mallay Enterprise predictably changed once she began cooperating. Therefore, the high burden of admissibility articulated in McKeon has not been met. Defendants' reliance on United States v. GAF Corp., 928 F.2d 1253 (2d Cir. 1991), is similarly misplaced, as there, defendants sought to introduce a bill of particulars which, in a subsequent trial against them, was amended to narrow the scope of the criminal conduct alleged by the government. Id. at 1257-8. Introduction of an earlier bill of particulars alleging additional conduct would, in that case, serve to demonstrate reasonable doubt as to those allegations subsequently retracted by the government. Id. at 1261-2. In the instant case, not only are the defendants different in the two cases, but there has been no retraction of any charges or allegations as to either James or Mallay, making the "unusual history and circumstances" surrounding GAF, see id. at 1255, inapplicable.

and weight the credibility of the witness at trial." DiPaolo, 835 F.2d at 51. In this instance, given the weight of evidence presented before this Court against both Defendants, neither has demonstrated the necessity of a hearing.

## CONCULSION

Defendant James' motions for a judgment of acquittal pursuant to Rule 29(c) and for a new trial pursuant to Rule 33 are hereby denied. Defendant Mallay's motions for a judgment of acquittal is denied. Defendants' joint motion for a new trial pursuant to Rule 33 is also denied.

## SO ORDERED.

DATED: March 18 , 2009
      Brooklyn, New York

s/Hon. Sterling Johnson, Jr.
_____
Sterling Johnson, Jr., U.S.D.J.